# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UPMC MERCY,<br><br>    Plaintiff,<br><br>  v.<br><br>KATHLEEN SEBELIUS, Secretary,<br>United States Department of Health and<br>Human Services,<br><br>    Defendant. | Civil Action 09-01286 (HHK) |

## MEMORANDUM OPINION

  Plaintiff UPMC Mercy ("UPMC"), a hospital located in Pittsburgh, Pennsylvania, brings this action against Kathleen Sebelius ("the Secretary") in her official capacity as Secretary of the Department of Health and Human Services ("DHHS"), seeking review of a DHHS decision regarding the accrual of interest on underpayments by the government to Medicare providers. Specifically, UPMC challenges a determination that interest does not begin to accrue on amounts owed to providers by the government until certain steps are taken by the fiscal intermediaries who are responsible for dispensing payments to providers. Before the Court are the parties' cross-motions for summary judgment [## 22, 25]. Upon consideration of the motions, the oppositions thereto, and the record of this case, the Court concludes that UPMC's motion must be granted and the Secretary's motion must be denied.

## I. BACKGROUND

### A. The Hurry-Up-and-Pay Statute and the Implementing Regulations

Under the Medicare Act, 42 U.S.C. § 1395 *et seq.*, hospitals that provide certain inpatient services to Medicare patients are reimbursed for their costs by the government via fiscal intermediaries, usually insurance companies that serve as the Secretary's agents for this purpose. *See In re Medicare Reimbursement Litig.*, 414 F.3d 7, 8 (D.C. Cir. 2005). Hospitals seeking reimbursement file "cost reports" with the intermediaries, which then audit those reports and issue "notices of program reimbursement" ("NPRs") that state the amount owed to the hospitals by the government. If a hospital disagrees with the contents of an NPR, it may appeal to the Provider Reimbursement Review Board ("PRRB" or "the Board"). PRRB determinations are in turn subject to review by the Administrator of the Centers for Medicare and Medicaid ("CMS"). Hospitals may seek judicial review of decisions by either the Administrator or the PRRB under 42 U.S.C. § 1395oo(f).

In 1983, Congress amended the Medicare Act to incentivize prompt correction of underpayments and overpayments under this scheme. Congress added a provision, 42 U.S.C. § 1395g(d), referred to as the Hurry-Up-and-Pay Statute, that provides for the accrual of interest — at a high rate — on "the balance of [any] excess or deficit not paid or offset" within 30 days of a "final determination" of an underpayment or overpayment. Significantly, the statute does not define "final determination."

In order to implement the Hurry-Up-and-Pay Statute, CMS issued a regulation, which took effect concurrently with the statute, defining "final determination." During the events at issue in this case, the regulation provided that:

[A]ny of the following constitutes a final determination:

(i) A Notice of Amount of Program Reimbursement (NPR) is issued . . . and either—
   (A) A written demand for payment is made; or
   (B) A written determination of an underpayment is made by the intermediary after a cost report is filed.

(ii) In cases in which an NPR is not used as a notice of determination (that is, primarily under part B), one of the following determinations is issued—
   (A) A written determination that an overpayment exists and a written demand for payment;
   (B) A written determination of an underpayment; or
   (C) An Administrative Law Judge (ALJ) decision that reduces the amount of an overpayment below the amount that [CMS] has already collected.

42 C.F.R. § 405.378(c)(1) (1998). As further discussed below, the original regulation was adopted in 1982 without a notice-and-comment period, although CMS subsequently issued a revised version in 1984 that included changes based on comments received after the rule was issued. CMS also made some alterations to the language of this provision without notice and comment in 1991.

**B. Factual Background**

The events that gave rise to this case began in 1991, when Blue Cross of Western Pennsylvania ("Blue Cross"), acting as the Secretary's fiscal intermediary, recouped over $9,700,000 in alleged overpayments from UPMC. UPMC timely appealed Blue Cross's assessment of its costs to the PRRB. In 1998, the Board issued its decision, ordering Blue Cross to reclassify a number of UPMC's expenses. J.A. at 88–171 (PRRB Hearing Decision 98-D26, Jan. 28, 1998).[1] According to UPMC, this decision resulted in a "substantial award of more than

---

[1] The Court's citations to the parties' joint appendix employ the page numbers automatically applied to the document by the district court ECF system and not the (non-

$13,500,000 in UPMC Mercy's favor, and . . . effectively reversed Blue Cross'[s] improper earlier recoupment of more than $9,700,000." Pl.'s Mem. in Supp. of Summ. J. ("Pl.'s Mem.") at 13. It is uncontested, however, that the Board's decision did not contain a specific dollar amount that UPMC was owed by the government.

The Board's January 1998 decision was interpreted differently by UPMC and Blue Cross. Blue Cross issued a revised NPR based on the Board's decision and paid UPMC the full amount specified by that NPR. According to UPMC, however, the revised NPR and resulting payment did not adequately reflect the amount UPMC was owed pursuant to the Board's decision. Thus, UPMC appealed to the Board again. In 2008, while that appeal was still pending, Blue Cross finally conceded that it had miscalculated the amount owed to UPMC, issued another NPR, and paid the remainder. The question remained, however, whether UPMC was entitled to receive interest on the amount that had gone unpaid from 1998 to 2008. Accordingly, UPMC revised its PRRB appeal to address that question.

UPMC, counting from the date of the Board's 1998 decision, calculated that it was owed over $9,000,000 in interest as of March 2008. Pl.'s Mem. at 22. The Board, however, disagreed, ruling that its own 1998 decision had not been a "final determination" of an underpayment for the purposes of the Hurry-Up-and-Pay Statute's interest provision. Rather, the Board concluded that although it had "identified specific amounts for reallocation in its [1998] decision, the final determination of the amount due could only be determined by [Blue Cross] via revisions to the cost report and [the issuance of] a revised NPR." J.A. at 11 (PRRB Hearing Decision 2009-D22, May 8, 2009). Thus, because Blue Cross had paid UPMC within 30 days of issuing its revised

---

sequential) Bates-stamp numbers that appear in the lower corner of each page.

NPR in 1998, the Board concluded that the statute's interest provision had never been triggered and UPMC was due no interest.[2] UPMC subsequently commenced this action, seeking judicial review of the Board's 2009 decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.

## II. LEGAL STANDARD

Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review, which requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)). Because, however, "the district judge sits as an appellate tribunal" in such cases, *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), the usual summary judgment standard does not apply. Rather, "it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, [and] 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Stuttering Found.*, 498 F. Supp. 2d at 207 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)).

---

[2] The PRRB concluded that because the amount on which interest accrues is determined by reference to the relevant "final determination," the fact that Blue Cross apparently misconstrued the PRRB's 1998 decision is without significance — once Blue Cross had paid the amount that it had determined was due, as recorded in the revised NPR, within 30 days, it had discharged its obligations under the Hurry-Up-and-Pay Statute.

# III. ANALYSIS

UPMC deploys an impressive array of arguments to challenge the Board's decision that UPMC was not entitled to interest, including that the Board's decision was inconsistent with the text of the interest-payment regulation, incompatible with the text and purpose of the Hurry-Up-and-Pay Statute, and would effectively allow the government to take interest-free loans from Medicare providers like UPMC.  The Court does not reach the majority of these arguments, however, because it agrees with UPMC's alternative argument that the applicable section of the interest-payment regulation was amended without notice and comment in violation of the APA.

**A.     UPMC Has Abandoned or Conceded Its Claim That the Regulation Was Originally Promulgated in Violation of the APA's Notice and Comment Procedures**

The Secretary understands UPMC to challenge the validity of the interest-payment regulation not only on the basis of its 1991 amendment (discussed below), but also because of the process by which it was originally enacted in 1982.  *See* Def.'s Opp'n at 32–36.  The Secretary understandably reaches this conclusion on the basis of UPMC's complaint, which states: "[T]he Secretary's hurry-up-and-pay interest regulation is entitled to no deference because it was *both promulgated, and later amended* in pertinent part, without notice and an opportunity for comment and without a logical (or other) explanation . . . ." Compl. ¶ 145 (emphasis added). None of UPMC's three subsequent filings, however, addresses the validity of the regulation's original promulgation, focusing only on its 1991 amendment.  *See* Pl.'s Mem. at 43–45; Pl.'s Opp'n at 44–45; Pl.'s Reply at 25.  Accordingly, it appears that UPMC has abandoned its challenge to the regulation's original enactment.

Further, even if UPMC has not deliberately abandoned its challenge to the regulation's original enactment, the Court concludes that UPMC has conceded the Secretary's arguments on this point. The Secretary asserts that the regulation was originally adopted without notice and comment pursuant to the good-cause exception of 5 U.S.C. § 553(b)(B), or, in the alternative, that any initial failure to provide notice and comment was subsequently cured by post-comment amendments. Def.'s Opp'n at 32–34. UPMC has not responded to any of these arguments; accordingly, the Court deems them conceded. *See Lewis v. District of Columbia*, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (quoting *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd* 2004 WL 1178772 (D.C. Cir. 2004)) (internal quotation marks omitted)). Accordingly, the Court turns to UPMC's argument regarding the 1991 amendment of the regulation.

**B.  The 1991 Amendment of the Regulation Violated the APA Because the Amendment Was Not Subject to the Interpretative Rule Exception to the APA's Notice-and-Comment Requirement**

As originally enacted, the provision of the interest-payment regulation that was applied by the Board in this case (which was at the time codified in section 405.376 rather than 405.378) read:

> For purposes of this section, a final determination is deemed to occur . . . [u]pon the issuance of both a Notice of Program Reimbursement (NPR), as discussed in § 405.1803, and . . . a written determination of an underpayment by the intermediary after the cost report is filed.

42 C.F.R. § 405.376(c)(1)(i) (1988). In 1991, the provision was amended to read:

> For purposes of this section, any of the following constitutes a final determination: (i) A Notice of Amount of Program Reimbursement (NPR) is issued, as discussed in §§ 405.1803, 417.576, and 417.810, and . . . [a] written determination of an underpayment *is made* by the intermediary after a cost report is filed.

42 C.F.R. § 405.376(c)(1)(i) (1992) (emphasis added). This change was made without the notice-and-comment procedures described in the APA.

UPMC argues that this change of subsection (i)(B) from "a written determination of an underpayment by the intermediary" to "a written determination of an underpayment *is made* by the intermediary" constituted a substantial and unexplained change to the meaning of "final determination." Pl.'s Mem. at 44. Prior to the change, UPMC asserts, "a 'final determination' included a written determination of an intermediary's underpayment — whether the determination was made by the intermediary or another, higher-level administrative actor, such as the PRRB." Pl.'s Mem. at 44. The addition of "is made" before "by the intermediary," however, narrows the range of possible actors who can make a written determination to one — the intermediary itself. Thus, UPMC asserts, the Secretary effected a "sleight of hand" by which she materially changed the meaning of the regulation without providing notice and an opportunity for comment as required by the APA.

The Secretary responds that the addition of "is made" had no impact whatsoever on the meaning of subsection (i)(B). Rather, she avers, "[t]he previous language referred to a 'written determination' of an underpayment 'by the intermediary,' not by the PRRB, and the current regulation likewise makes reference to a written determination 'by the intermediary.'" Def.'s Opp'n at 35. To her, this revision was a "minor stylistic change" that merely clarified the prior

8

meaning of the regulation, and was thus subject to the interpretative rule exception to the APA's notice-and-comment procedures. Further, the Secretary asserts that UPMC is without standing to challenge this amendment because "the addition of 'is made' had no effect on the Board's decision in this case," meaning that, even if notice-and-comment procedures were required, UPMC was not harmed by Secretary's the failure to follow them. The Secretary's arguments are unpersuasive.

The APA requires agencies to publish a notice of each proposed rulemaking and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c). This general requirement is subject to exceptions for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(A). The interpretative rule exception applies to those agency statements or regulations that "explain ambiguous language, or remind parties of existing duties — not [those that] create new law." *Sentara-Hampton Gen. Hosp. v. Sullivan*, 980 F.2d 749, 759 (D.C. Cir. 1992). This is not to say that interpretative rules can have no effect on the behavior of parties or their interactions with the agency; rather, "[s]uch effects are entirely permissible under the interpretative rule exception, so long as the rule represents the agency's *explanation* of a statutory or regulatory provision, and the rule is not intended to substantively change existing rights and duties." *Id*. (emphasis added). In general, the interpretative rule exception "is to be narrowly construed and only 'reluctantly countenanced.'" *Id.* (quoting *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984)). Further, the courts do not defer to an agency's own characterization of a rule as interpretative, but rather engage in their own inquiry. *See Sprint Corp. v. FCC*, 315 F.3d 369, 374–75 (D.C. Cir. 2003).

In determining whether agency material falls within the bounds of the interpretative rule exception, courts in this circuit apply a four-factor test designed to gauge whether the rule at issue has legal effect. They ask:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). If *any* of these questions is answered in the affirmative, the rule is not interpretative and must undergo notice and comment. *Id.*

Applying the foregoing test, the Court has little difficulty concluding that the amended regulation is not an interpretative rule. The answer to the second and fourth questions is clearly yes: the amended regulation is published in the Code of Federal Regulations, and not only "effectively amends a prior legislative rule," but also literally does so.[3] Thus, the regulation as amended lies beyond the scope of the interpretative rule exception.

The Secretary's argument that the 1991 amendment was interpretative appears to rest on the assumption that the Court's focus should rest not on the regulation as amended but rather on the specific changes that were made during amendment. Thus, the Secretary focuses solely on the addition of "is made," arguing that this change, standing by itself, fits within the interpretative rule exception. *See* Def.'s Opp'n at 35–36. Yet the Secretary identifies no case, nor is the Court aware of any, that has allowed changes to the actual text of a regulation that

---

[3] The Secretary does not argue, nor could she, that the pre-amendment regulation was itself an interpretative rule under this test.

otherwise falls outside of the interpretative rule exception on the ground that those changes were merely technical or stylistic. In the absence of such precedent — and given that the interpretative rule exception is only reluctantly countenanced — the Court cannot conclude that a doctrine that forbids agencies from "constructively rewrit[ing] [a] regulation" in the guise of clarifying it allows them to *literally* rewrite a portion of a regulation with the same justification. *See Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236 (D.C. Cir. 1992); *cf. British Caledonian Airways, Ltd. v. Civil Aeronautics Bd.*, 584 F.2d 982, 990 (D.C. Cir. 1978) (holding an agency order to be interpretative where it clarified existing rights and obligations "without any change in the content of the relevant language"). Accordingly, the Court concludes that the 1991 amendment of the interest-payment regulation without notice and comment fell outside of the interpretative rule exception and violated the APA.[4]

The Court is likewise unpersuaded by the Secretary's argument that UPMC has no standing to challenge the lack of notice-and-comment procedures during the 1991 amendment. *See* Def.'s Opp'n at 36. The cases cited by the Secretary in support of that assertion involved a different type of claim. There, plaintiffs who were interested in the impact of a rule that was adopted without notice and comment argued that "the mere denial of notice and comment to a party interested in the ultimate agency rule establishes, by itself, a separate and remediable injury . . . which confers standing on that party." *Renal Physicians Ass'n v. Dep't of Health & Human*

---

[4] This outcome does not restrict agencies' ability to clarify the meaning of regulations that seem unclear without going through the cumbersome notice-and-comment process. Here, the Secretary could have issued a policy statement, order, manual, or other document, stating that she understood subsection (i)(B) to refer only to determinations made by intermediaries of underpayments. Such an interpretation would still be entitled to some deference. *See United States v. Mead Corp.*, 533 U.S. 218, 235 (2001).

*Servs.*, 422 F. Supp. 2d 75, 85 (D.D.C. 2006) (internal quotation marks omitted). Here, by contrast, the injury for which UPMC seeks redress is not the lack of notice and comment itself, but rather the Board's allegedly erroneous denial of UPMC's interest claim. By virtue of that injury, UPMC uncontestedly has standing to challenge the Board's decision as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). UPMC's argument in support of that challenge — that the Board erroneously applied a regulatory provision that was amended in violation of the APA — does not constitute a separate claim for which UPMC must independently demonstrate standing. *See FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 477 (1940) (holding that a party who had demonstrated an injury sufficient to confer standing to appeal from an agency decision could "raise . . . any relevant question of law in respect of the order of the [agency]"); CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3531.16 (2010) ("Once a party is properly in court to challenge a particular injury-causing event, the range of permissible argument may properly be measured by prudential concerns. . . . [T]he court should be free to consider the arguments that seem to provide the most secure basis for decision without undue concern for the conceptual nexus between argument and injury."). Moreover, as discussed immediately below, the challenged agency decision relied on the improperly amended regulation. Thus, UPMC does not lack standing to challenge the Secretary's failure to employ notice-and-comment procedures during the 1991 amendment of the interest-payment regulation.

**C.     Because the Challenged Board Decision Relied on the Regulatory Provision that Was Amended in Violation of the APA, that Decision Was Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law**

The fact that the 1991 amendment of the interest-payment regulation violated the APA requires the Court to grant summary judgment for UPMC and remand to the Secretary. Although subsection (i)(B) is not cited directly in the Board's decision, both parties agree that the Board applied it, *see* Pl.'s Opp'n at 33–34; Def.'s Opp'n at 8–9, and the language of the Board's decision closely parallels the language of the amended provision. *Compare* 42 C.F.R. § 405.378(c)(1)(i)(B) (1998) ("A written determination of an underpayment is made by the intermediary after a cost report is filed."), *with* J.A. at 11 (" . . . the final determination of the amount due could only be determined by the intermediary via revisions to the cost report and a revised NPR . . . ."). Indeed, the fact that the Board's decision is almost entirely unexplained strongly suggests that the Board simply applied subsection (i)(B), which — post-amendment — plainly forecloses UPMC's interest claim.[5] Thus, the Court must vacate and remand. *See PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) ("[W]hen a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards."); *cf. SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("[A]n administrative order

---

[5] The Secretary's assertion, as part of her standing argument, that "the addition of 'is made' had no effect on the Board's decision in this case," Pl.'s Opp'n at 36, is both unsupported and implausible. The Secretary elsewhere admits that the Board reached its decision by applying subsection (i)(B), *see* Pl.'s Opp'n at 8–9, and the addition of "is made" to that provision precludes UPMC's interpretation and mandates the outcome reached by the Board. The fact that the Board wrote "determined by the intermediary" instead of "made by the intermediary" does not suggest that it was not influenced by the plain text of the regulation it was concededly applying. Indeed, in the absence of any other explanation of the Board's reasoning, the Court must conclude that the Board simply effected what it saw as the clear command of the regulation.

cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.").

Finally, the Court notes that vacatur is necessary here not because the result reached by the Board would be an impermissible construction of the *pre*-amendment regulation; the Court expresses no opinion as to that question. Rather, vacatur is necessary because the Board appeared to believe that the result it reached was *compelled* by the text of the regulation as amended. It is possible that the Board could validly reach the same result for different reasons on remand. The Court's opinion should not be read to preclude that possibility. *See Phillips Petroleum Co. v. FERC*, 792 F.2d 1165, 1172 (D.C. Cir. 1986) (remanding where the agency erroneously believed its decision to be mandated by judicial precedent, and noting that the agency was free on remand to interpret the regulation in question using its own judgment). Any future Board interpretations of the interest-payment regulation will judged by the strength of the rationales offered by the Board at that time.[6]

---

[6] The Court notes that, even if the Board's decision had not been based on an improperly amended regulation, it would risk invalidation for failing to articulate any reasoning or rationale. *See, e.g.*, *Envtl. Def. Fund, Inc. v. EPA*, 898 F.2d 183, 189 (D.C. Cir. 1990) (explaining that the courts cannot sustain unexplained agency actions "on the basis of interpretive theories that the agency might have adopted and findings that (perhaps) it might have made"); *cf. Teva Pharm. USA, Inc. v. FDA*, 441 F.3d 1, 4 (D.C. Cir. 2006) ("We declined to evaluate the reasonableness of the FDA's statutory interpretation because the agency provided no explanation . . . ."). Indeed, the Board's decision is so vague that it is largely unclear what the Board ultimately concluded, let alone why. In such cases, meaningful judicial review is difficult. *Benvenuti v. Dep't of Defense*, 587 F. Supp. 348, 356 (D.D.C. 1984); *see United States v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 294 U.S. 499, 510–11 (1935) ("We must know what a decision means before the duty becomes ours to say whether it is right or wrong.").

## IV.  CONCLUSION

For the foregoing reasons, UPMC's motion for summary judgment [#22] must be granted and the Secretary's motion for summary judgment [#25] must be denied.  An appropriate order accompanies this memorandum opinion.

                                                  Henry H. Kennedy, Jr.
                                                  United States District Judge